**Arthur H. BONNEY, et al.,
Plaintiffs–Appellants,**

v.

**ENVIRONMENTAL ENGINEERING, INC., Fru–Con Construction Corporation, and Travelers Casualty and Surety Company of America, Defendants–Respondents.**

**No. 27306.**

Missouri Court of Appeals,
Southern District,
Division Two.

March 29, 2007.

Motion for Rehearing or Transfer
Denied May 4, 2007.

Application for Transfer Denied
June 26, 2007.

Donald R. Aubry, Jolley Walsh Hurley Raisher & Aubry, P.C., Kansas City, for plaintiffs-appellants.

Scott R. Pool, Kara Linnemeyer, Gibbs Pool and Turner, P.C., Jefferson City, for defendants-respondents.

PHILLIP R. GARRISON, Judge.

This appeal arises from an action filed by forty laborers (collectively referred to as "Plaintiffs") for unpaid wages due under the Missouri Prevailing Wage Act

("PWA"), Sections 290.210 to 290.340,[1] as a result of work performed on the construction of a prison. Plaintiffs contend the trial court erred in adopting the calculations of the Missouri Division of Labor Standards ("DLS"); in rejecting their calculations for damages; in failing to award prejudgment interest and attorneys fees; in giving deference to an investigative report conducted by the DLS; in denying their motion to amend the pleadings; in not addressing the claims of certain Plaintiffs who were mischaracterized as apprentices; and failing to award Plaintiffs statutory doubling pursuant to Section 290.300. For the reasons stated we affirm in part, reverse in part, and remand.

## FACTS AND PROCEDURAL HISTORY

Fru–Con Construction Company ("Fru–Con") was the general contractor for the construction of a new State prison ("prison project") in Licking, Missouri. The prison project was a "public works project," because it was being constructed for "public use and benefit" by, or on behalf of, a "public body." Section 290.210(6)-(7). Therefore, the prison project was subject to the PWA. Section 290.230.

Environmental Engineering, Inc. ("Environmental Engineering") subcontracted with Fru–Con to perform insulation work on the project. Environmental Engineering subcontracted the insulation and asbestos work to Rex Snider, d/b/a Insulation Specialties ("Insulation Specialties"). Because the prison project was subject to the PWA, all contractors and subcontractors were required to comply with Annual Wage Order No. 4 ("Wage Order"), which was the DLS's determination of the prevailing hourly rate of wages for building construction for Texas County. Sections 290.230 and 290.250. The Wage Order

established building construction wage and fringe benefit rates for asbestos workers on the project, totaling $23.29 per hour, consisting of a $17.52 hourly wage, and a fringe benefit payment of $5.77 per hour for each hour worked.

Fru–Con, as required by Sections 290.250 and 107.170.2, procured a Performance and Payment Bond in the amount of $58,375,545 with Travelers Casualty and Surety Company of America ("Travelers"), guaranteeing, among other things, the payment of wage and fringe benefit payments, as required by the PWA, to the workers on the project.

Insulation Specialties had a "Trade Agreement" with the International Association of Heat and Frost and Asbestos Workers, Local 63 ("Local 63"). Insulation Specialties, which obtained its work force on this project through Local 63 and a company called Express Personnel, worked on the project from approximately March 1999 through July 2000. Plaintiffs were employed by Insulation Specialties as asbestos workers for the purpose of performing asbestos work at various times on the project.

At the conclusion of the project, the DLS conducted an investigation following their receipt of a complaint that Insulation Specialties withheld certain amounts for each hour worked from the employees' after-tax wages and failed to remit them to the proper fringe benefit fund. This complaint also alleged that some of the checks written to the fringe benefit fund on behalf of the workers did not clear the bank due to insufficient funds.

In November 2000, before the DLS completed its investigation, Plaintiffs filed a petition in the instant action, pursuant to Section 290.300, in Greene County

**1.** All statutory references are to RSMo (2000) unless otherwise indicated.

Circuit Court against Insulation Specialties, Environmental Engineering, Fru–Con, and Travelers for double the difference between the wages and fringe benefits paid for their work on the prison project and the wages and fringe benefits required by the PWA.[2] Environmental Engineering and Fru–Con are both liable for any payments made by Insulation Specialties that are less than the prevailing wage because the PWA "statutes clearly place the onus for compliance with prevailing wage laws ... on the contractor ... and provide the contractor with remedies against a subcontractor for whose violations the contractor is liable." *Board v. Eurostyle, Inc.*, 998 S.W.2d 810, 813 (Mo. App. S.D.1999). As a surety, Travelers' liability is coextensive with that of Fru–Con.[3] *See City of Kansas City ex rel. Jennings v. Integon Indem. Corp.*, 857 S.W.2d 233, 236 (Mo.App. W.D.1993).

During the course of its investigation, the DLS obtained information and documents from Insulation Specialties and others to determine if there was an underpayment of wages and/or fringe benefits. In December 2000, the DLS filed a "Prevailing Wage Inspection Report" ("report") finding that fifty-three workers were due wages and penalties. The report stated that the "[v]iolation found resulted from underpayment of wages and fringe benefits due to overtime hours being paid at straight time and apprenticeship violation [because] workers listed [as apprentices]

were not enrolled in [an authorized apprenticeship] program." The DLS calculated the amount of underpaid wages and fringe benefits for the fifty-five workers to be $65,308.58 and assessed a penalty of $15,220. It recommended that this matter be referred to the office of the Attorney General for review of the penalty amount found due.

The State of Missouri filed an interpleader action in St. Louis County Circuit Court stating that certain employees of the various contractors who worked on the project, including employees working for Insulation Specialties, were entitled to back wages. Defendants entered into a settlement agreement in March 2001 with the State of Missouri whereby they paid forty-seven underpaid employees of Insulation Specialties the $58,743.49 that the DLS determined was owed.[4] Defendants also paid a penalty to the State of Missouri for their failure to pay the prevailing wage.

In the instant action, a bench trial was held on May 10 and 11, 2005, to determine the difference between what Plaintiffs received and the "rates provided by the contract." Section 290.300. The terms of the settlement agreement in the interpleader action provided that the trial court was to credit the amount Defendants had paid Plaintiffs pursuant to the settlement agreement toward any amount it determined was owed Plaintiffs. During the course of the trial, Plaintiffs presented evidence concerning workers who were not

---

2. In December 2000, Insulation Specialties filed for bankruptcy and is no longer a party in this matter.

3. For the remainder of this opinion Fru–Con, Environmental Engineering, and Travelers will be collectively referred to as "Defendants."

4. The DLS report determined that fifty-five workers were underpaid while working for Insulation Specialties on the prison project.

All of these workers were parties to the interpleader action. However, only forty-seven of these workers were parties to the settlement agreement. The eight workers absent from the settlement agreement account for the $6,565.09 difference between the $65,308.58 determined by the DLS report and the $58,743.49 paid pursuant to the settlement agreement. The eight workers not included in the settlement agreement are not parties in this case.

listed as parties on the original petition. Defendants moved to strike this evidence, which the trial court sustained. Plaintiffs then brought a motion to amend their pleading to add additional parties.

On September 9, 2005, the trial court issued its "Memorandum and Judgment" stating that: (1) Plaintiffs' motion to amend to add additional parties well beyond the expiration of the statute of limitations is overruled; (2) the calculations to determine underpayments and resulting penalties by the DLS is adopted; (3) Plaintiffs' position that fringe benefits should be doubled like wages pursuant to Section 290.300 is without authority; and, (4) Defendants have paid in full pursuant to the DLS's calculations. The judgment was entered for Defendants at the cost of Plaintiffs. Plaintiffs appeal this judgment.[5]

For ease in analysis, we choose not to address the points in the order presented.

### Point V

In their fifth point, Plaintiffs claim the trial court erred in denying their motion to amend their pleadings to add as plaintiffs twelve individuals (collectively, "omitted individuals"), who were not named in the original pleadings. They argue that, contrary to the trial court's finding, the statute of limitations did not bar the claims of these omitted individuals.

During trial, the Plaintiffs presented evidence concerning the amount of damages they believed was due. This evidence included testimony by James G. Walsh, Jr. ("Walsh"), an attorney with the firm representing Plaintiffs. During direct examination, Walsh testified as to what he believed the total damages were, and the Plaintiffs offered, and the court admitted without

objection, Exhibits 30 and 31, which were summaries of Walsh's calculations. Exhibits 30 and 31 included calculations of proposed damages for the omitted individuals. During cross-examination, Defendants moved to strike all of Walsh's testimony "regarding total damage calculations because based on [his] testimony, these entire damage calculations have been based in substantial part on individuals who are not parties to this action," and strike "portions of Exhibits 30 and 31 that deal with nonparties." Plaintiffs acknowledged that the omitted individuals were not named as plaintiffs in the original petition and moved to amend the pleadings.

The trial court sustained Defendants' motion to strike the testimony as to total damages and portions of the exhibits dealing with the omitted individuals. It then took Plaintiffs' motion to amend their petition under advisement and allowed the parties time to file post-trial briefs on the motion. When issuing its judgment the trial court denied Plaintiffs' motion to amend stating:

> Plaintiff seeks to add 12 Plaintiffs not previously included in the petition. While Courts freely grant leave to amend to change parties or to amend the claims on facts alleged, here plaintiff seeks to add parties well beyond the expiration of the statute of limitations for this type of case. Plaintiff's motion is overruled.

Plaintiffs claim this overruling was erroneous.

The decision whether to grant Plaintiffs' motion to amend the pleadings was within the discretion of the trial court. Rule 55.33(a); *Jaron Corp. v. Pellet*, 866

---

**5.** We deny Defendants' motion to dismiss Plaintiffs' appeal which was taken with the case.

■■■■■■■■■■■■■■■

S.W.2d 897, 902 (Mo.App. S.D.1993).[6] While Rule 55.33(a) provides that leave to amend be "freely given when justice so requires," there is not an absolute right to amend the pleadings. *Jaron Corp.*, 866 S.W.2d at 902. The denial of a motion to amend is "presumed correct and the burden is on the proponent to show that the trial court palpably and obviously abused its discretion." *Id.* A ruling is an abuse of discretion when it is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Id.* The trial court did not abuse its discretion in denying Plaintiffs' motion to amend.

■■■■■ The statute of limitations for a claim of unpaid wages brought under the PWA is three years. Section 516.400; *State ex rel. Griffin v. R.L. Persons Construction, Inc.*, 193 S.W.3d 424, 427 (Mo. App. S.D.2006). A statute of limitations begins running when the right to bring a suit accrues. *Griffin*, 193 S.W.3d at 427. Generally, the right to bring suit "accrues and the statute of limitations is set into motion '[w]hen the *fact of damage* becomes capable of ascertainment ...' even if the actual amount of damage is unascertainable." *Id.* (quoting *M & D Enters., Inc. v. Wolff*, 923 S.W.2d 389, 394 (Mo.App. S.D. 1996)) (emphasis in original).

In this case, everyone agrees that the three-year statute of limitations applies to this action. The Plaintiffs are claiming damages for work done on the prison project between June 1999 and June 2000. The original petition was timely filed on November 20, 2000. Plaintiffs' motion to amend was made on May 10, 2005.

Plaintiffs make three arguments stating why the trial court erred in finding that the statute of limitations barred their motion to amend. First, they state that under Rule 55.33(b) the original pleadings should be treated as including the omitted individuals as plaintiffs because Defendants consented to having the omitted individuals' claims tried by the court. Second, they state that the claims of the omitted individuals should relate back to the original pleadings under Rule 55.33(c). Finally, they state that Defendants were estopped from asserting a statute of limitations defense to the motion to amend. These claims are without merit.

■■■ Plaintiffs first claim the evidence shows Defendants consented to having the claims of the omitted individuals tried by the court and, therefore, Rule 55.33(b) treats the omitted individuals as if they had been included in the original pleadings. Rule 55.33(b) states that "when issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Contrary to Plaintiffs argument, Rule 55.33(b) does not allow for the claims of additional *parties* to be treated as if they were named in the pleadings by express or implied consent. Instead, by its clear language, Rule 55.33(b) only states that *issues* can be treated as if they had been raised in the pleadings. Therefore, Rule 55.33(b) does not treat the omitted individuals as if they were included as plaintiffs in the original pleadings.

■■■ Plaintiffs also claim the statute of limitations does not bar the omitted individuals' claims because Rule 55.33(c) per-

**6.** All references to rules are to Missouri Rules of Civil Procedure (2005) unless otherwise indicated.

mits these claims to relate back to the original timely filed pleadings.

The eastern district succinctly discussed this issue in *Goodkin v. 8182 Maryland Assoc. Ltd. P'ship*, 80 S.W.3d 484 (Mo.App. E.D.2002). It stated:

> Rule 55.33(c) allows amended pleadings filed out of time to relate back to the original pleading in certain situations. Although this Rule may be used for more than merely correcting a misnomer, the failure to timely plead must have been caused by a mistake in selecting the proper party to sue. That is, the plaintiff must have sued the wrong party. Rule 55.33(c) is a remedy for mistakes in *identity*, and the remedy is a *change* in party. Therefore, the Rule does not apply if the plaintiff wants to add a party to the suit. A mistake in failing to add a party defendant does not trigger relation-back.

*Id.* at 488–89 (emphasis in original) (internal quotations and citations omitted). Because Plaintiffs are attempting to add the omitted individuals to the suit, Rule 55.33(c) does not apply and there is no relation back to the original pleadings. Therefore, the three-year statute of limitations bars adding the omitted individuals to the suit.

▮ Plaintiffs further claim Defendants are estopped from asserting a statute of limitations defense to their motion to amend because Defendants had previously acknowledged that these omitted individuals were parties to this action. In support, the Plaintiffs point to two pieces of evidence, the settlement agreement and Defendants' response to their motion for summary judgment, which they claim estops Defendants from asserting the statute of limitations.

The settlement agreement was for the interpleader action filed by the State of Missouri in the circuit court of St. Louis County, Missouri. The omitted individuals were listed as parties in this settlement agreement. The settlement agreement, which was signed by Defendants, stated, "The above parties to this agreement ... are also parties to a lawsuit, *Bonney et al. v. Fru–Con Construction, et al.,* case no. 10CC4479, in the circuit court in Green [sic] County Missouri." [7] This settlement agreement was offered and admitted into evidence without objection during the trial.

Plaintiffs' motion for summary judgment also labeled the omitted individuals as "plaintiffs" in paragraphs 7 and 9 of its statement of material facts. In their response to this motion, Defendants denied paragraph 7 stating, "[Defendants] deny all of plaintiffs were properly classified as asbestos workers." Defendants also denied paragraph 9, which discussed two omitted individuals, as "plaintiffs." In their denial Defendants referred to these two workers as "plaintiffs."

Plaintiffs claim that because Defendants twice, in the settlement agreement and in their response to the motion for summary judgment, referred to the omitted individuals as "plaintiffs," and never told Plaintiffs or the court that the omitted individuals were not parties to the action, they are now estopped from asserting a statute of limitations defense.

▮ "The purpose of the doctrine of equitable estoppel is to prevent a party from taking inequitable advantage of a situation he or she has caused." *Weiss v. Rojanasathit*, 975 S.W.2d 113, 120 (Mo. banc 1998). We have strictly applied stat-

---

7. Because it does not affect the outcome of our discussion and for ease in reading we will treat the settlement agreement as if it included all of the omitted individuals. In actuality, it only includes ten of the omitted individuals as parties.

utes of limitations and "exceptions and estoppels have been rather grudgingly found." *Dixon v. Shafton*, 649 S.W.2d 435, 440 (Mo. banc 1983). "The Supreme Court of Missouri has articulated the rule as estopping 'a defendant ... from setting up the statute where, his conduct, though not fraudulent, has nevertheless induced the plaintiff to delay in bringing suit until after the expiration of the statutory period.'" *McCrary v. Truman Medical Center, Inc.*, 916 S.W.2d 831, 833 (Mo.App. W.D.1995) (quoting *Sugent v. Arnold's Estate*, 340 Mo. 603, 101 S.W.2d 715, 718 (1937)). A court will rarely find that a party is estopped from asserting the statute of limitations "unless that party has made positive efforts to avoid the bringing of suit against him or misled the claimants." *M & D Enters., Inc.*, 923 S.W.2d at 400.

The signing of a settlement agreement acknowledging the omitted individuals as parties to this lawsuit is not a "positive effort" by Defendants to mislead or prevent Plaintiffs from bringing a suit against them. Plaintiffs have not demonstrated how the settlement agreement induced them not to timely amend the pleadings to include the omitted individuals. Nothing in the settlement agreement shows Defendants promising or persuading Plaintiffs not to amend their pleadings within the statute of limitations period, and it was clearly not Defendants' duty to seek to amend the pleadings to add twelve additional plaintiffs.

Plaintiffs' motion for summary judgment and Defendants' response also provides no support for Plaintiffs' estoppel claim. The motion for summary judgment was filed on July 13, 2004, after the statute of limitations had expired in 2003. Even if Defendants in their response had denied the factual statements because the omitted individuals were not "plaintiffs" to the lawsuit, as we believe Plaintiffs are suggesting

Defendants should have, any motion to amend to add the omitted individuals at that time would have still been barred by the statute of limitations.

In attempting to shape their estoppel argument, Plaintiffs are contending, in effect, that Defendants should have told them that they made a mistake and forgot to include the omitted individuals in the original pleadings. Plaintiffs and Defendants are adversaries, each represented by counsel. Defendants owe no duty to inform Plaintiffs of any defense they might choose to interpose as evidence is presented regarding the omitted individuals' claims for damages in a suit where the omitted individuals are not listed parties. *See cf. Garoutte v. Farmers Mutual Ins. Co. of Lawrence County*, 823 S.W.2d 526, 531 (Mo.App. S.D.1992) (stating that the defendant did not owe plaintiff a duty to inform him that if, after plaintiff voluntarily dismissed his suit, he later brings a new action outside the twelve-month limitation that defendant would seek to enforce this time limitation). Further, Defendants have "no obligation to inform a potential plaintiff that he or she has a cause of action" against them. *McCrary*, 916 S.W.2d at 833.

The trial court did not abuse its discretion in denying Plaintiffs' motion to amend their pleadings and add the omitted individuals as parties. Point five is denied.

**Point III**

In their third point, Plaintiffs claim the trial court erred in treating the investigative report of the DLS as an administrative decision subject to judicial deference.

As noted, near the conclusion of the prison project the DLS received a complaint that Insulation Specialties was not paying the prevailing wage and that some of the paychecks had not cleared the bank

because of insufficient funds. The DLS filed their report finding that Insulation Specialties had underpaid wages and fringe benefits for fifty-five workers and as a result penalties should be assessed. The report individually calculated the underpaid amount for each worker and determined that wages in the total "amount of $65,308.58 were not collected for workers on this project due to the contractor not being able to agree on an amount for delinquent fringe benefits due[.]" At the time of the report, Defendants did not wish to pay the penalties that were assessed and the DLS recommended the report "be referred to the Attorney General['s] Office for review of penalty amount due."

The DLS report was offered and admitted into evidence at trial by Defendants. During the trial, Defendants extensively argued that the Plaintiffs had the burden of disproving the DLS report and that the trial court should treat the report with deference. During their opening statement Defendants stated that the DLS "performed specific calculations that ... showed underpayments," and these "calculations have never been appealed or contested by any party in any proceedings." "[T]herefore, given the factual determination that's been made by the [DLS], unless for whatever reason [the trial court] were to determine that the [DLS] exceeded its authorities—authority by performing these calculations in this investigation or it's against the overwhelming weight of the evidence or against the constitution, then those findings ... should be followed[.]" Defendants further declared in their opening that Plaintiffs had "the burden to prove to the [trial court] with respect to the calculations done by the [DLS] that there was something arbitrary, capricious,

or unconstitutional about those calculations for [the trial court] not to follow the [DLS] calculations."

When issuing its judgment the trial court made the following finding:

> Evidence presented at trial involved calculations to determine underpayments and resulting penalties available under Section 290.300[ ]. The Court is persuaded by Defendant's argument that Plaintiffs failed to establish that the investigations and conclusions of the [DLS] were invalid. The Court therefore will adopt those calculations.

Defendants, in their brief, claim that the trial court did not give deference to the DLS report, but rather independently examined the evidence and adopted the calculations contained in the DLS report. We cannot agree. In their opening statement Defendants specifically urged the trial court to treat the DLS report with deference and contended that the Plaintiffs had the burden to show the calculations in the DLS report were "arbitrary, capricious, or unconstitutional." In its findings, the trial court said it was persuaded by Defendants' argument and found that Plaintiffs "failed to establish that the investigations and conclusions of the [DLS] were invalid." We therefore agree with Plaintiffs that the trial court accorded the DLS report deference. The question now is whether such deference was erroneous.

■ ، We review a court-tried case under the standard elucidated in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).[8] We will affirm the judgment of the trial court unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* Plaintiffs claim that the trial court erroneously de-

---

8. *Murphy* interpreted the provisions of Rule 73.01(c). The provisions of that rule now appear in essentially the same form in Rule 84.13(d).

clared and applied the law when it treated the DLS report with deference.

It appears that Defendants argued that the DLS report should be treated by the trial court in the same manner as that of an administrative decision in a contested case. In essence, Defendants asked the trial court to, and the trial court did in fact, act as if it was reviewing a contested case under Section 536.140 and give deference to the DLS report. *See Angelos v. State Bd. of Registration for Healing Arts*, 90 S.W.3d 189, 191–92 (Mo.App. S.D.2002) (explaining the standard of review for contested cases under Section 536.140). However, the DLS did not conduct a contested case "because there was no charge, notice, hearing, judgment, findings of fact or conclusions of law, or record of proceedings." *Essex Contracting, Inc. v. City of DeSoto*, 775 S.W.2d 208, 215 (Mo.App. E.D.1989). These are attributes of a contested case under Chapter 536. *Id.*

 Further, this is not a review of an administrative action at all. Rather, it is a suit brought by workmen, authorized by Section 290.300, for the difference between the amount paid to them and the prevailing wage rate. This suit is independent of any action of the DLS. In fact, the DLS is not authorized to sue for back wages, as this right was specifically conferred upon the individual workman. *State, Dept. of Labor and Indus. Relations, Div. of Labor Standards v. SKC Elec., Inc.*, 936 S.W.2d 802, 804 (Mo. banc 1997). The DLS is only authorized to institute actions for penalties. *Id.*

 Instead of treating this case as a review of an administrative decision, the trial court should have treated it as a civil "suit for wages." Section 290.300. The general standard of proof for civil cases is preponderance of the evidence. *See State ex rel. Amrine v. Roper*, 102 S.W.3d 541, 548 (Mo. banc 2003) (stating that the burden of proof in "ordinary civil cases" is "preponderance of the evidence"). Therefore, for Plaintiffs to be successful in an action under Section 290.300 they need to prove by a preponderance of the evidence that they were "paid for [their] services in a sum less than the stipulated rates for work done under the contract." Section 290.300.

The trial court erred in granting deference to the DLS report and placing the burden on Plaintiffs to establish that the calculations contained in the DLS report were invalid. We reverse and remand.[9]

### Point I

 In their first point, Plaintiffs claim the trial court erred in not doubling the underpaid wages pursuant to Section 290.300.[10] It appears, after a careful reading of the point, that Plaintiffs are alleging two specific issues on appeal. First, they claim the trial court erroneously found that underpaid "fringe benefits" should not be doubled under Section 290.300. Second, they claim that the trial court erred in not doubling the total amount it determined Defendants had underpaid in wages because it found Defendants had previously paid Plaintiffs in full pursuant to the settlement agreement. We find Plaintiffs arguments for both issues persuasive. In

9. Nothing in this opinion is meant to imply that the calculations of the DLS are wrong or inaccurate or that on remand the trial court cannot choose, after analyzing the credibility and weight of all the evidence, to adopt the calculations contained in the DLS report.

10. Even though we are reversing and remanding under Point III, we choose to address this point because the trial court made a specific finding regarding the law which if not addressed now could be repeated and perhaps become the basis of a future appeal.

doing so, we again note that our review is governed by *Murphy*, 536 S.W.2d at 32.

When issuing its judgment the trial court issued the following finding:

Plaintiff's position that "fringe benefits" should be doubled as are wages pursuant to Section 290.300[ ] is without authority. Rules of statutory interpretation do not support such a conclusion.

Plaintiffs claim this finding was erroneous because the "prevailing hourly rate of wages" includes amounts representing fringe benefit contributions and Section 290.300 requires doubling of the difference between the amount paid and the "prevailing hourly rate of wages."

Section 290.300 states:

Any workman employed by the contractor or by any subcontractor under the contractor who shall be paid for his services in a sum less than the stipulated rates for work done under the contract, shall have a right of action for double whatever difference there may be between the amount so paid and the rates provided by the contract together with a reasonable attorney's fee to be determined by the court, and an action brought to recover same shall be deemed to be a suit for wages, and any and all judgments entered therein shall have the same force and effect as other judgments for wages.

Section 290.300 relates to, and provides penalties on contractors who do not comply with, the provisions of Section 290.250. *Eurostyle, Inc.*, 998 S.W.2d at 812. Section 290.250 demands that public bodies undertaking public works construction projects require contractors to pay "not less than the prevailing hourly rate of wages ... to all workmen performing work[.]"

"Prevailing hourly rate of wages" is a term of art specifically defined by Section 290.210(5), which states:

"Prevailing hourly rate of wages" means the wages paid generally, in the locality in which the public works is being performed, to workmen engaged in work of a similar character *including the basic hourly rate of pay and the amount of the rate of contributions irrevocably made by a contractor or subcontractor to a trustee or to a third person pursuant to a fund, plan or program, and the amount of the rate of costs to the contractor or subcontractor which may be reasonably anticipated in providing benefits to workmen and mechanics pursuant to an enforceable commitment to carry out a financially responsible plan or program which was communicated in writing to the workmen affected, for medical or hospital care, pensions on retirement or death, compensation for injuries or illness resulting from occupational activity, or insurance to provide any of the foregoing, for unemployment benefits, life insurance, disability and sickness insurance, accident insurance, for vacation and holiday pay, for defraying costs of apprenticeship or other similar programs, or for other bona fide fringe benefits,* but only where the contractor or subcontractor is not required by other federal or state law to provide any of the benefits; provided, that the obligation of a contractor or subcontractor to make payment in accordance with the prevailing wage determinations of the department, insofar as sections 290.210 to 290.340 are concerned, may be discharged by the making of payments in cash, by the making of irrevocable contributions to trustees or third persons as provided herein, by the assumption of an enforceable commitment to bear the costs of a plan or program as provided herein, or any combination thereof, where the aggregate of such payments, contributions and costs is not

less than the rate of pay plus the other amounts as provided herein.

(emphasis added). Thus, "prevailing hourly rate of wages" includes fringe benefits.

The PWA instructs that contractors pay workmen the "prevailing hourly rate of wages" pursuant to Section 290.250. This "prevailing hourly rate of wages" includes all the fringe benefit payments generally paid in the locality where the work is being performed pursuant to its definition in Section 290.210(5). When the "prevailing hourly rate of wages," including the appropriate fringe benefits, are not paid to a workman, that workman is entitled to bring suit for double damages under Section 290.300. Therefore, the trial court erred in finding that there was no statutory authority allowing him to double any underpaid fringe benefits.

Defendants contend the plain language of Section 290.300 does not allow fringe benefits to be doubled and assert that any other reading would "require this Court to engraft upon the statute words or provisions that do not appear there." *SKC Elec., Inc.*, 936 S.W.2d at 804. They claim that had the Legislature intended unpaid fringe benefits to be doubled they would have specifically referred to the "prevailing hourly rate of wages" in Section 290.300. Instead, Section 290.300 includes the phrases, "stipulated rates for work done under the contract" and "rates provided by the contract." Defendants interpret the term "rates" as referring to basic hourly rates, overtime rates, and holiday rates stated in the Wage Order provided by the DLS for work done in Texas County.

The Wage Order sets out the dollar amount that is paid generally for specific types of work in Texas County. Any public works constructed in Texas County must comply with these figures pursuant to the PWA. The Wage Order lists a number of specific occupations and for each occupation lists: (1) basic hourly rate; (2) overtime rate; (3) holiday rate; and (4) total fringe benefit.

Defendants state that because Section 290.300 refers to "rates" it only allows Plaintiffs to statutory doubling if they are underpaid the basic hourly rate, overtime rate, or holiday rate as set out in the Wage Order, and does not entitle them to double any underpaid fringe benefits because "benefits" are not "rates" under the plain meaning of the statute. We disagree.

We read the terms "stipulated rates for work done under the contract" and "rates provided by the contract" to refer to the "prevailing hourly rate of wages." *See State ex. inf. Webster ex. rel. State, Dept. of Labor and Indus. Relations, Div. of Labor Standards v. City of Camdenton*, 779 S.W.2d 312, 318 (Mo.App. S.D.1989) (stating that the "stipulated rates" in Section 290.300 "must be construed to mean the applicable prevailing wages"). Section 290.250 specifically requires that a clause declaring that not less than the "prevailing hourly rate of wages" will be paid to workmen "be inserted in the contract." Therefore, when Section 290.300 refers to "rates" in the contract it is referring to the "prevailing hourly rate of wages."

Further, the plural term "rates" does not require a contrary reading. It does not necessitate we find that it refers to the basic hourly rate, overtime rate, and holiday rate of the Wage Order as proffered by Defendants. Instead, we read the term "rates" as allowing a workman who performs different jobs on the public works project, and therefore is entitled to more than one "prevailing hourly rate of wages" under the contract, to get double damages

for his total amount underpaid.[11] *See cf. Bledsoe Plumbing & Heating, Inc. v. Eldorado Springs R–II School Dist.*, 189 S.W.3d 591 (Mo.App. S.D.2006) (workmen worked as both plumbers and sheet metal workers and were entitled to double the amount they were underpaid using the "prevailing hourly rate of wages" for a plumber and the "prevailing hourly rate of wages" for a sheet metal worker, or two "rates" under the contract).

This reading does not "engraft upon the statute words or provisions that do not appear there," *SKC Elec., Inc.*, 936 S.W.2d at 804, but instead gives effect to the plain meaning of the words used and, where they may be doubtful, interprets them in light of the context and the obvious policy and object of the PWA. *Eurostyle, Inc.*, 998 S.W.2d at 814.

Therefore, the trial court erred in the finding that fringe benefits were not entitled to statutory doubling under Section 290.300.

■■■ Plaintiffs also contend that the trial court erred in failing to double the entire award because it found Defendants had paid in full pursuant to the settlement agreement. The trial court, as previously discussed, found the total underpaid amount to be the amount determined in the DLS report. The DLS report found the total amount Defendants owed as a result of their "underpayment of wages and fringe benefits." Since Defendants had already paid this amount, pursuant to the settlement agreement, the trial court did not double the award. Plaintiffs claim this was erroneous.

The question we are faced with is whether the statutory doubling provision in Section 290.300 applies when a defendant pays underpaid workmen for its underpayment before the trial begins.

In this case, the DLS was informed on May 11, 2000, that there was a possible PWA violation on the prison project. Plaintiffs filed their petition for underpaid wages on November 20, 2000. The DLS completed its investigation in December 2000. Defendants paid the underpaid Plaintiffs the amount of wages and fringe benefits determined by the DLS to be underpaid pursuant to the settlement agreement on March 8, 2001. The trial took place in 2005 and the judgment was issued on September 9, 2005.

In determining that Defendants did not owe any money to Plaintiffs, the trial court found that Defendants had already paid Plaintiffs the amount it found was underpaid pursuant to the settlement agreement. Therefore, it found that Defendants had paid in full and it did not double this amount. Plaintiffs claim that the trial court should have first doubled the amount it determined to be underpaid, and then subtracted the amount Defendants paid pursuant to the plea agreement. We agree with Plaintiffs.

■■■ Defendants argue that Plaintiffs are not entitled to statutory doubling because Section 290.300 is penal and, strictly construed, it does not require doubling when the underpayments are paid in full as soon as the amounts are discovered and calculated by the DLS. Defendants are correct that Section 290.300 is a penal

11. For example, assume a workman is hired to work on the construction project. He first works as an asbestos worker and is paid less than the "prevailing hourly rate of wages" for an asbestos worker. He then works as a painter on the same project and is paid less than the "prevailing hourly rate of wages" for a painter. This workman would have the right to bring suit, pursuant to Section 290.300, for double the amount he was underpaid using both "rates under the contract" or more specifically each individual underpaid "prevailing hourly rate of wages."

statute. *See Laszewski v. R.L. Persons Constr., Inc.,* 136 S.W.3d 863, 867 n. 7 (Mo.App. S.D.2004); *Eurostyle, Inc.,* 998 S.W.2d at 812–814. Penal statutes must be strictly construed. *Spradlin v. City of Fulton,* 982 S.W.2d 255, 261 (Mo. banc 1998); *Eurostyle, Inc.,* 998 S.W.2d at 813.

Defendants point us to Section 290.210(5), wherein a contractor or subcontractor can meet his obligation to pay the prevailing wage "by making payments in cash, by the making of irrevocable contributions to trustees or third persons ..., by the assumption of an enforceable commitment to bear the costs of a plan or program ..., or any combination thereof." They claim that because there is no express time limitation listed in Section 290.210(5), their making the settlement payment in 2001 satisfied their obligation under the PWA. According to Defendants, the statutory purpose behind the doubling penalty of Section 290.300 is deterrence. Specifically, to deter contractors and subcontractors from never paying a workman his underpaid wages or for delaying in making payments after the DLS has determined the amount owed. We disagree.

■ We find two primary statutory purposes behind Section 290.300. First, it provides an underpaid worker with "significant incentives to enforce the law on his or her own behalf by allowing double damages and attorney's fees." *SKC Elec., Inc.,* 936 S.W.2d at 804. It also is a statute that imposes a penalty, and as such, is "intended to punish the wrongdoer and deter others." *Spradlin,* 982 S.W.2d at 261.

■ The conduct that Section 290.300 attempts to deter and punish is not, as Defendants assert, for never paying a workman or for delaying in making payments after a DLS determination of the amount owed. Rather, it is intended to deter and punish contractors and subcontractors who do not pay the worker his or her prevailing wages *at the time payment becomes due* under his or her contract. Such an interpretation is consistent with the language of Section 290.300.

Section 290.300 reads, "Any workman ... who shall be paid ... in a sum less than the stipulated rates for his work ... shall have a right of action for double whatever difference there may be between the amount so paid and the rates provided by the contract[.]" This section does not refer to the difference between the prevailing wage and *any* payment made by the contractor or subcontractor at *any* time after the work is done. Instead, the phrase "so paid" in this section refers to the initial payment received by the workman that was "in a sum less than" the prevailing wage. Therefore, the statute requires doubling of the amount withheld from the workman in the initial payment he received for the work performed.

This interpretation is consistent with our treatment of other doubling provisions. For example, Section 534.330 allows a landowner to recover double the reasonable rental value of premises during the period of unlawful detainer. *Gordon v. Williams,* 986 S.W.2d 470, 474 (Mo.App. E.D.1998). In *Gordon,* during the period of unlawful detainer, the defendants had made rent payments. *Id.* In determining the award, the court first determined the reasonable rental value, doubled that amount, and then subtracted the amount of rental payments made by the defendants to calculate the total award. *Id.*

The trial court should have determined the amount of wages that Plaintiffs were underpaid, doubled that amount, and then subtracted out the amount that Defendants had previously paid pursuant to the settlement agreement.

## Point II

In their second point, Plaintiffs claim that the trial court erred in 1) not entering judgment based upon their calculations; 2) not awarding prejudgment interest; and 3) not awarding attorney's fees.

### (1) Plaintiffs' Calculations

 Plaintiffs' first claim under Point II is that the trial court erred in failing to enter judgment based upon their calculations. There is no merit to this claim. In a court-tried civil case it is the court's duty to judge the credibility of the witnesses and the weight to be given to their testimony. *Maserang v. Crawford County Sheriff's Dep't*, 211 S.W.3d 118, 121 (Mo. App. S.D.2006). The judge is free to believe none, part, or all of the testimony and chooses between conflicting evidence. *Id.* We defer to these determinations. *Id.*

Therefore, the trial court was free to reject Plaintiffs' calculations and Plaintiffs have not stated a legal reason why it was erroneous to do so other than to state that they were somehow better or more credible than the DLS's or Defendants' calculations. This claim is denied.[12]

### (2) Prejudgment Interest

 Plaintiffs' second claim under Point II is that the trial court erred in not awarding them prejudgment interest. However, the trial court found for Defendants and, therefore, there was no judgment awarded in Plaintiffs' favor. Without a judgment there is no basis for prejudgment interest. *Paric Corp. v.* *Murphy*, 903 S.W.2d 285, 291 (Mo.App. E.D.1995).

We are aware that upon remand judgment may be entered in Plaintiffs' favor and the issue of whether Section 290.300 allows for prejudgment interest may arise. However, until the time the trial court makes a determination on that issue we have nothing to review because "to review an issue not having been decided by the trial court would be akin to rendering an advisory opinion, something appellate courts are wont not to do." *Daniel v. Indiana Mills & Mfg., Inc.*, 103 S.W.3d 302, 318 (Mo.App. S.D.2003).

### (3) Attorney's Fees

Plaintiffs' third claim under Point II is that the trial court erred in not awarding them attorney's fees. Because the trial court found, in essence, that Plaintiffs did not have a claim under Section 290.300, it did not award attorney's fees. Because, as we have stated, Plaintiffs have a claim for, at a minimum, double what Defendants have already paid and we are reversing and remanding this case we need not now review this claim. To do so would be rendering an advisory opinion. *Id.*

## Point IV

In Plaintiffs' fourth point on appeal, they claim the trial court erred in failing to address certain workers who were misclassified and paid as apprentices. In light of our disposition of Point III we need not address this claim as we are unaware how

---

12. We note that during the trial, Plaintiffs were represented by William Jolley and Donald Aubry of Jolley Walsh Hurley Raisher & Aubry, P.C. Plaintiffs called one witness, Walsh, who performed the calculations relating to the amounts Plaintiffs claimed they were underpaid. Walsh was a founding partner of Jolley Walsh Hurley Raisher & Aubry, P.C. He says he is semi-retired and no longer "actively practice[s] law" but he "still goes to the office just about every day and help[s] out with different projects." Walsh also advised Plaintiffs' attorneys during the course of the trial on courses of action they should take. Specifically, it was only after the suggestions and discussions with Walsh that Plaintiffs' attorneys attempted to use Rule 55.33(b) to add the omitted individuals.

the trial court will analyze these workers' claims on remand. Any discussion at this point would be mere speculation.

### Conclusion

The trial court did not abuse its discretion in denying Plaintiffs' motion to amend their pleadings and add twelve omitted individuals. It did err in: (1) giving the DLS report deference and holding that Plaintiffs had the burden of disproving the calculations of the DLS; and (2) in finding that the statutory doubling provision of Section 290.300 did not apply to Plaintiffs' claims. We reverse and remand for further proceedings not inconsistent with this opinion.

BARNEY, J., and LYNCH, J., concur.